## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) | REBECCA ROYSTON, | |
| | Plaintiff, | |
| v. | | Case No.:  18-CV-265-RAW |
| (2) | BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF BRYAN, | |
| (3) | JOHNNY CHRISTIAN, his is official capacity, | |
| (4) | TURN KEY HEALTH CLINICS, LLC, | |
| (5) | JOHN AND JANES DOES 1-10, | |
| | Defendants. | |

## COMPLAINT

Plaintiff, Rebecca Royston, ("ROYSTON") for her cause of action against the above-named Defendants, would state as follows:

### I.

### PARTIES, JURISDICTION, VENUE

1. ROYSTON is a resident and citizen of the State of Oklahoma.

2. The Board of County Commissioners of the County of Bryan ("BOARD") is the legislative entity with non-delegable statutory responsible for providing a jail facility for Bryan County, Oklahoma that is adequate for the safe-keeping of inmates. *See* 57 O.S. § 41. BOARD is the proper party for all state law claims against the county. *See* 19 O.S. § 4 ("In all suits or proceedings by or against a county, the name in which a county shall sue or be sued shall be,

'Board of County Commissioners of the County of _____,'"). Under state law, Board is liable for the actions of county employees under a theory of *respondeat superior* consistent with common law principles set forth in *Baker v. Saint Francis Hosp.*, 2005 OK 36, 126 P.3d 602.

3.      Johnny Christian ("CHRISTIAN"), is the elected Sheriff of Bryan County, Oklahoma. CHRISTIAN is the final policy-maker for the operational aspects of the Bryan County Detention Center ("BCDC") and the implementation of all BCDC policies. As the Sheriff of Bryan County, CHRISTIAN owed a non-delegable duty to provide all persons detained at the BCDC with adequate medical care. At all times relevant hereto, CHRISTIAN was acting as the sheriff of Bryan County. He is sued in his official capacity only.

4.      Turn Key Health Clinics, LLC, ("TURN KEY") is a domestic for-profit limited liability company. TURN KEY was the medical service provider at the BCDC in August 2017. JOHN AND JANES DOES 1-10 are or were agents and employees of TURN KEY,

5.      The events complained of below occurred in Bryan County, Oklahoma, which is within the territorial jurisdiction of this Court. This court has subject-matter jurisdiction based on the existence of federal questions.

## II.

### STATEMENT OF FACTS

6.      Records indicated that in the early morning hours of August 20, 2017, ROYSTON's husband placed a call to 911 seeking medical assistance for his wife.

7.      Records indicate that deputies from the Bryan County Sheriff's Office ("BCSO") responded to the call and arrived before the EMTs.

8.     Records indicate that the deputies were told that ROYSTON was off her medication for bi-polar disorder. Records indicate the deputies also suspected that ROYSTON was under the influence.

9.     Records indicate the deputies observed that ROYSTON was naked and being held down by her husband who was trying to prevent her from leaving the property.

10.     Records indicate the deputies placed ROYSTON in handcuffs before the medics arrived because she was kicking and jerking her arms.

11.      Records indicate that responding medics noted that ROYSTON had no obvious injuries, but that she was dirty and rolling on the ground.

12.     Records indicate that the deputies also observed that ROYSTON was randomly asking questions that did not pertain to the situation.

13.     Records indicate that the deputies and medics were prepared to transport ROYSTON for higher level care, but they repeatedly deferred to ROYSTON's decision-making.

14.     Records indicate the deputies then transported ROYSTON to the BCDC.

15.     Records indicate that ROYSTON was processed into the BCDC on August 20, 2017 at approximately 2:24 a.m. Records indicate that she was charged with indecent exposure, disturbance of the peace, and public intoxication.

16.     Records indicate that once in the BCDC, deputies observed that ROYSTON was uneasy on her feet, and had a hard time keeping her balance.

17.     Section 1.1 of the Medical Services Contract between the BCSO and TURN KEY provides that TURN KEY is "responsible for all medical care for all inmates at the Facility" which "commences with the commitment of the inmate to the custody of the Facility and ends with the release of the inmate."

3

18.     Upon information and belief, TURN KEY did not have a medical provider at the BCDC to provide any medical assessment or medical care for ROYSTON at the time she was booked into the BCDC on August 20, 2017.

19.     ROYSTON's Booking Summary includes the notation "HIGHLY INTOXICATED".

20.     The BSCO Arresting Officer Information Sheet includes the following question and response: "*Has Prisoner Ingested Large Quantities of Alcohol/Drugs*?" "*No*."

21.     Section 1.17(3) of the Medical Services Contract between the BCSO and TURN KEY required TURN KEY to "review all intake screenings performed by detention staff for inmates upon admission to the facility," but the contract only required Turn Key to provide "up to 42 hours a week of on-site Medical Personnel (RN, LPN, MA) coverage." *See* Section 1.17(2)(a).

22.     Based on the terms of the Medial Services Contract, the BCSO and CHRISTIAN would know that TURN KEY was not required to provide any on site medical coverage for the remaining 126 hours during the week.

23.     The Medical Services Contract also required TURN KEY to provide 24 hour on-call coverage by a physician or midlevel provider, but there is no indication from ROYSTON's records that BCSO attempted to contact a provider at the time of admission, and there is no indication that TURN KEY made a responsive provider available during ROYSTON's admission for BSCO to contact.

24.     At the time of ROYSTON's intake, the Oklahoma Jail Standards also required a "Medical/mental health screening by trained facility personnel utilizing a questionnaire approved

4

by the Department of Health, or a screening conducted by a physician or other licensed medical personnel." *See* O.A.C. 310:670-5-1(1)(C).

25.     There is no indication from records provided by the BSCO that TURN KEY, or anyone affiliated with the BCSO, completed a medical intake screening for ROYSTON at any time during her detention on August 20, 2017.

26.      At 9:45 a.m.—approximately 7.5 hours after ROYSTON had arrived, DOE LPN, employed by TURN KEY, created a Progress Note with the following information:

   a)      Patient is currently in isolation cell for protection due to high intoxication;

   b)      Unable to obtain vital signs;

   c)      Unable to communicate with patient;

   d)      Occasionally eyes open and roll back;

   e)      Patient is on 15 minute checks per security;

   f)      Mental health has been notified;

   g)      EMS was at scene prior to booking, unable to provide care per deputy.

27.     DOE'S progress note made no reference to any screening by some medical provider or trained facility personnel, it does not identify any effort to contact a physician or midlevel provider, it does not describe any care provided by a mental health provider, registered nurse, or physician, and there is no outside referral for care by anyone else.

28.     Section 1.17(3) of the Medical Services Contract between the BCSO and TURN KEY required TURN KEY to provide coverage by a Mental Health Professional through an on-site clinic or tele-health services up to 3 hours each week.

5

29.     Based on the terms of the Medial Services Contract, the BCSO and CHRISTIAN would know that TURN KEY was not required to provide any on site coverage for the remaining 165 hours during the week.

30.     There is no indication from the records provided by the BCSO that any mental health professional responded to the notice memorialized in the progress note created at 9:45 a.m., and there is no indication that TURN KEY or BCSO made any arrangements to provide ROYSTON with care from any mental health professional.

31.     At 2:30 p.m., DOE LPN created a second progress note. After being held by the BCSO for over 12 hours, the second progress note indicates that ROYSTON was sent to the hospital for medical clearance from a mental health facility "per security".

32.     The second progress note makes no reference to any head injury, or any care provided by a mental health provider, registered nurse, or physician.

33.     The second progress note does not detail any intervening care, treatment, or observations by any medical provider, mental health or otherwise.

34.     Almost an hour later, at 3:23 p.m., the physician documentation from the emergency department at the hospital indicates that ROYSTON "present[ed] to [the] ER via Law Enforcement" with "altered mental status" "confusion" "decreased mental status" and "decreased responsiveness."

35.     The hospital records indicate the onset of symptoms was "unknown" and that ROYSTON's "last known well witnessed" was "greater than 2 hours" of her arrival at the emergency room.

36.     Hospital records indicate that one or more transporting deputies informed hospital staff that "Once [ROYSTON] was detained, she became combative, so they handcuffed her and

6

put her in the cell" and that "[ROYSTON] banged her head against the concrete wall several times last night but since this morning she has pretty much just laid still unless someone touched her or tried to move her then she would become very combative."

37.     The hospital records indicate that "ROYSTON arrive[sic] in handcuffs and shackles" and that responding EMS "picked her up out of the floor of the jail cell."

38.     The hospital providers noted that the severity of her condition prevented ROYSTON from contributing information.

39.     The conditions noted in the hospital records include observations that ROYSTON "appears obviously ill" that "she is very hot to the touch" that she has multiple bruises over entire body, including her head, moderate ecchymosis to the head/face, forehead, right and left temples, eyes, neck, chest, abdomen, back.

40.     The hospital records recorded a Glasgow Coma Score of 6 at the time of admission, which is indicative of a severe brain injury.

41.     Hospital records show a CT scan was ordered at 3:32 p.m. and an endotracheal tube was inserted.

42.     The radiology results for the CT identified blood in the subarachnoid space, additional blood in the right cerebellum, cerebral edema, a midline-shift right to left between 2.5 to 3 mm, and an acute subdural hematoma over the right frontal lobe.

43.     At 6:46 p.m., hospital records indicate that ROYSTON was transferred by air ambulance to Medical City in Plano, TX where she remained in a coma for several days.

44.     Hospital records from Texas indicate that ROYSTON was left unattended at the BCDC in excess of 10 hours.

7

45.     ROYSTON was not medically cleared before she was booked into the BCDC, and upon information and belief, this was consistent with the practice at the BCDC.

46.     ROYSTON was never assessed by a mental health professional at the BCDC, and upon information and belief, this was consistent with the practice at the BCDC.

47.     ROYSTON was never assessed by a physician at the BCDC, and upon information and belief, this was consistent with the practice at the BCDC.

48.     ROYSTON was never assessed by a registered nurse at the BCDC, and upon information and belief, this was consistent with the practice at the BCDC.

49.     Consistent with practice, the BCSO did not report ROYSTON's transfer for outside medical care to the Oklahoma State Department of Health Jail Inspection Division.

50.     The BCSO did not conduct timely welfare checks on ROYSTON as required by the Oklahoma Jail Standards.

51.     The BCSO and TURN KEY did not provide any care to ROYSTON despite knowledge that her conditioned worsened after hitting her head against a concreate wall.

52.     The BCSO and TURN KEY did nothing for ROYSTON despite obvious injuries all over her body.

53.     The BCSO and TURN KEY did nothing for ROYSTON despite her obvious need for medical care even prior to BCSO deputies presenting her for booking.

54.     Upon information and belief, no BCSO or TURN KEY employee was disciplined in relation to ROYSTON's detention.

55.     Upon information and belief, the lack of discipline by the Sheriff or TURN KEY, and the lack of any effort to penalize TURN KEY, evinces CHRISTIAN's approval of the manner in

8

which BCSO employees and TURN KEY disregarded ROYSTON's medical needs through policies, practices, customs, or usages.

56.     ROYSTON suffered from a serious medical condition at the time of booking and throughout her detention.

57.     ROYSTON's need for medical care would have been obvious to anyone who encountered her, and it was obvious in fact to the deputies and EMTs who recognized her need for medical care.

58.     Despite the seriousness of ROYSTON's condition, and despite her obvious need for medical care, BSCO and CHRISTIAN failed to take steps to provide adequate care, and that failure directly resulted in ROYSTON's injuries, prolonged pain, permanent injury, and a worsening of her condition.

59.     CHRISTIAN implemented a written policy or unwritten practice, or acquiesced in its use, to admit arrestees to the BCDC without providing an adequate medical screening. The use of this policy or practice increased the substantial risk of serious harm to arrestees like ROYSTON who were medically compromised when presented to the facility for admission.

60.     CHRISTIAN implemented a written policy or unwritten practice, or acquiesced in its use, to classify arrestees for housing at the BCDC without providing an adequate risk assessment for the arrestee. The use of this policy or practice increased the substantial risk of serious harm to arrestees like ROYSTON who were medically compromised when presented for admission to the facility.

61.     CHRISTIAN implemented a written policy or unwritten practice, or acquiesced in its use, to provide medical care at the BCDC through a medical services contractor despite

knowledge the contractor was only required to provide care for a limited number of hours each week. The use of this policy or practice increased the substantial risk of serious harm to arrestees like ROYSTON who were medically compromised when presented for admission to the facility during times that were not covered by the Medical Services Contract.

62.    CHRISTIAN implemented a written policy or unwritten practice, or acquiesced in its use, to conduct intake assessments of arrestees using jailers who were not adequately trained to evaluate the medical needs of those presented for admission. The use of this policy or practice increased the substantial risk of serious harm to arrestees like ROYSTON who were medically compromised when presented for admission to the facility during times that were not covered by the Medical Services Contract.

63.    CHRISTIAN implemented a written policy or unwritten practice, or acquiesced in its use, to delay the transport of arrestees in need to medical care to outside facilities. The use of this policy or practice increased the substantial risk of serious harm to arrestees like ROYSTON who were medically compromised when presented for admission to the facility, and whose conditions worsened by the delay in providing care.

64.    CHRISTIAN implemented a written policy or unwritten practice, or acquiesced in its use, to delay or deny adequate mental health assessments to arrestees presented for admission. The use of this policy or practice increased the substantial risk of serious harm to arrestees like ROYSTON who were medically compromised when presented for admission to the facility, and who suffered from known mental health conditions, like bi-polar disorder.

65.    CHRISTIAN implemented a written policy or unwritten practice, or acquiesced in its use, to

10

### III.

#### STATEMENT OF CLAIMS

#### CONDITIONS OF CONFINEMENT
#### UNLAWFUL POLICY OR CUSTOM
#### DELIBERATE INDIFFERENCE
#### 42 U.S.C. § 1983

66.     Plaintiff hereby adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

67.     Based upon the facts set forth above, ROYSTON contends that Defendant CHRISTIAN, in his official capacity, through written policy or unwritten practice authorizing the conduct above, deprived ROYSTON of the right to adequate medical care and the right to be free from dangerous conditions of confinement, as secured by the Fourteenth Amendment to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983, for which CHRISTIAN is liable in his official capacity, through implementation of unlawful policies, procedures, customs, or usages at the BCDC.

#### OKLA. CONST.
#### DUE PROCESS
#### ART. 2, SEC. 7

68.     Plaintiff hereby adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

69.     Based upon the facts set forth above, ROYSTON contends that agents or employees of the BCSO deprived her of the right to adequate medical care as secured by art. 2, section 7 of the Oklahoma Constitution, for which the BOARD is liable.

11

### DELIBERATE INDIFFERENCE
### ENTITY CLAIM
### 42 U.S.C. § 1983

70. Plaintiff hereby adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

71. Based upon the facts detailed above, Defendant TURN KEY, through written policy or unwritten practice authorizing the conduct above, deprived ROYSTON of the right to adequate medical care and the right to be free from dangerous conditions of confinement, as secured by the Fourteenth Amendment to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983, for which TURN KEY is liable through implementation of unlawful policies, procedures, customs, or usages at the BCDC.

### DELIBERATE INDIFFERENCE
### RESPONDEAT SUPERIOR CLAIM
### 42 U.S.C. § 1983

72. Plaintiff hereby adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

73. Based upon the facts detailed above, Defendant TURN KEY, through its agents and employees, deprived ROYSTON of the right to adequate medical care, and the right to be free from dangerous conditions of confinement, as secured by the Fourteenth Amendment to the United States Constitution actionable pursuant to 42 U.S.C. § 1983, for which TURN KEY is liable.

### DELIBERATE INDIFFERENCE
### INDIVIDUAL CLAIMS
### 42 U.S.C. § 1983

74. Plaintiff hereby adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

12

75.     Based upon the facts detailed above, Defendant JOHN AND JANE DOES 1-10 deprived ROYSTON of the right to adequate medical care, and the right to be free from dangerous conditions of confinement, as secured by the Fourteenth Amendment to the United States Constitution actionable pursuant to 42 U.S.C. § 1983, for which JOHN AND JANE DOES 1-10 are liable.

NEGLIGENCE
COMMON LAW

76.     Plaintiff hereby adopts and incorporates by reference the preceding paragraphs as if fully set forth herein.

77.     Based upon the facts detailed above, agents or employees of TURN KEY owed a duty of reasonable care to ROYSTON in complying with certain rules, regulations, policies, and procedures established by the BCSO and the State of Oklahoma related to the provision of custodial medical care, and that TURN KEY's breach of that duty caused Plaintiff's injuries.

WHEREFORE, Plaintiff respectfully requests the Court enter judgment in Plaintiff's favor and against all Defendants in amount in excess of $75,000.00.

Respectfully submitted,

BRYAN & TERRILL

By:     s/J. Spencer Bryan
        Steven J. Terrill, OBA # 20869
        J. Spencer Bryan, OBA # 19419
        BRYAN & TERRILL LAW, PLLC
        9 East 4th St., Suite 307
        Tulsa, OK 74103
        Tele:   (918) 935-2777
        Fax:    (918) 935-2778
        Email: sjterrill@bryanterrill.com
        Email: jsbryan@bryanterrill.com

**ATTORNEY LIEN CLAIMED**
**JURY TRIAL DEMANDED**